**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| A.G. CULLEN CONSTRUCTION, INC., ARLENE CULLEN, and PAUL CULLEN, | ) ) ) | |
| | ) | Civil Action No. 2:08-cv-01238-NBF |
| Plaintiffs, | ) ) | |
| | ) | Judge Nora Barry Fischer |
| v. | ) ) | |
| TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA; SHAWN A. PIKAS, ESQUIRE; DAVID C. DREIFUSS, ESQUIRE; JOANN BONACCI, ESQUIRE; and DREIFUSS BONACCI and PARKER, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**CONCISE STATEMENT OF MATERIAL FACTS IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT ON BEHALF OF DEFENDANTS,
TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA;
SHAWN A. PIKAS, ESQUIRE; DAVID C. DREIFUSS, ESQUIRE;
JOANN BONACCI, ESQUIRE; AND DREIFUSS BONACCI AND PARKER**

AND NOW, pursuant to LCvR 56.B.1, come the Defendants, Travelers Casualty

and Surety Company of America, Shawn A. Pikas, Esquire, David C. Dreifuss, Esquire,

JoAnne Bonacci, Esquire, and Dreifuss Bonacci and Parker, by their undersigned

counsel, and file this Concise Statement of Material Facts (hereinafter "CSMF") setting

forth the facts essential for the Court to decide Defendants' Motion for Summary

Judgment which the moving parties contend are undisputed and material, including any

facts which for purposes of the summary judgment motion only are assumed to be true:

A. **BACKGROUND**

1.      A.G. Cullen Construction, Inc. is a general contractor in the business of construction with its principal place of business located in Pittsburgh, Pennsylvania. *Deposition Transcript of Paul L. Cullen, October 12, 2009, p. 43.*

2.      Arlene Cullen is President and Treasurer of A.G. Cullen Construction, Inc. and owns sixty percent of the stock of the company. *Deposition Transcript of Paul L. Cullen, October 12, 2009, pp. 24, 25, 31.*

3.      Paul Cullen owns forty percent of the stock ownership and serves as Vice President and Secretary. *Deposition Transcript of Paul L. Cullen, October 12, 2009, pp. 25, 31.*

4.      Travelers Casualty and Surety Company of America (hereinafter "Travelers") is a Connecticut corporation engaged in the surety business. *Docket No. 37-4, p. 1.*

5.      Shawn A. Pikas, an employee in the Claims Department at Travelers, evaluates performance and payment bond claims related to bonds issued by Travelers. *Deposition Transcript of Shawn A. Pikas, October 26, 2009, p. 21.*

6.      David C. Dreifuss and JoAnne Bonacci are partners in the law firm, Dreifuss, Bonacci & Parker, LLP with offices in Florham Park, New Jersey. *Deposition Transcript of David C. Dreifuss, October 29, 2009, pp. 17-19, 21.*

7.     David Dreifuss has handled matters for Travelers in New York, New Jersey, Massachusetts, and Pennsylvania in connection with his extensive fidelity and surety practice during the past thirty years.   *Deposition Transcript of David C. Dreifuss, October 29, 2009, pp. 11-12, 15.*

8.     JoAnne Bonacci has practiced fidelity and surety law for twenty years and has practiced with Attorney Dreifuss since 1993.   She was admitted to practice law in the Commonwealth of Pennsylvania in 1990.   *Deposition Transcript of JoAnne Bonacci, February 17, 2010, pp. 4, 12, 14, 16, 144.*

9.     At the request of Arlene Cullen and Paul Cullen ("the Cullens") and A.G. Cullen Construction, Inc., Travelers Casualty and Surety Company of America (hereinafter "Travelers") issued surety bonds, on behalf of A.G. Cullen in connection with construction projects situated in the Commonwealth of Pennsylvania, including the following payment and performance bonds ("the Bonds"):

> (a)     Bond No. 104655062, Principal:   A.G. Cullen Construction, Inc., Owner:   County of Butler, Project:   New Butler County Prison, BP-04 General Trade and Detention Equipment (the "Butler Project")
>
> (b)     Bond No. 104655064, Principal:   A.G. Cullen Construction, Inc., Owner:  East Allegheny School District, Project:  New Logan Middle School, HHSDR #3230 (the "Logan Project")

*Performance and Payment Bonds (Docket No. 37-4).*

10.     The Bonds were issued by Travelers in consideration of and in reliance upon a General Agreement of Indemnity ("GAI") by and between Travelers, A.G. Cullen, and the Cullens, in their individual capacities dated October 26, 2005. *Indemnity Agreement (Docket No. 37-4).*

3

11.     In pertinent part, the GAI provides as follows:

> WHEREAS, in the transaction of business, Bonds have heretofore been and may hereafter be executed by Company [Travelers].   In connection with the execution, delivery and/or assumption of obligations of such Bonds, Company requires complete indemnification.
>
> NOW, THEREFORE, as an inducement to Company and in consideration of Company's execution and/or delivery of one or more Bonds, refraining from canceling one or more Bonds, and/or assumption of obligations by Company of one or more Bonds, and for other good and valuable consideration, the Indemnitors [the Cullens] jointly and severally agree with Company as follows:
>
> . . .
>
> 3.     Indemnification   and   Hold   Harmless: Indemnitors shall exonerate, indemnify and save Company harmless from and against all Loss.   An itemized, sworn statement by an employee of company, or other evidence of payment, shall be prima facie evidence of the propriety,   amount   and   existence   of Indemnitors' liability.  Amounts due to company shall be payable upon demand.

*Indemnity Agreement (Docket No. 37-4).*

12.     The Indemnification Agreement further requires that funds received by A.G. Cullen or the Cullens in connection with any contract underlying a bond issued by Travelers shall be held in trust, and provides Travelers with the right to demand that A.G. Cullen and the Cullens deposit such contract funds (the "Trust Funds") in a trust account:

> 9.     Trust Fund:  All payments due or received for or on account of any Contract, whether or not in the possession of any Indemnitor, shall be held in trust as trust funds by Indemnitors for the benefit and payment of all obligations for

> which Company as beneficiary may be liable
> under any Bond.  Company may open a trust
> account or accounts with a bank for the deposit
> of the trust funds.  Upon demand, Indemnitors
> shall deposit therein all trust funds received.
> Withdrawals from such trust accounts shall
> require the express consent of Company.

*Indemnity Agreement, ¶ 9 (Docket No. 37-4).*

13.    The Indemnification Agreement further grants Travelers a security

interest in, among other things, all accounts, contract rights, rights of payment, and

general intangibles of A.G. Cullen and the Cullens:

> 12.    Security Interest.    As security for their
> obligations hereunder, Indemnitors hereby
> grant to Company a security interest in the
> following properties, assets and rights of
> Indemnitors, wherever located, whether now
> owned or hereafter acquired or arising, and all
> proceeds and products thereof: all goods
> (including inventory, equipment and any
> accessions thereto), instruments (including
> promissory notes), documents, accounts,
> chattel paper, deposit accounts, letter-of-credit
> rights, securities and all other investment
> property, supporting obligations, any Contract
> or contract rights or rights to the payment of
> money, insurance claims and proceeds, and all
> general intangibles (the "Collateral").    This
> Agreement shall for all purposes constitute a
> Security Agreement for the benefit of Company
> in accordance with the Uniform Commercial
> Code ("UCC") and all similar statutes.

*Indemnity Agreement, ¶ 12 (Docket No. 37-4).*

14.    Travelers perfected its security interest in the property of A.G. Cullen,

and the Cullens, by filing a UCC-1 Financing Statement incorporating the GAI.

*Defendants' Counterclaim, ¶ 15 (Docket No. 59)*; *Plaintiffs' Answer to Counterclaim,*
*¶ 15 (Docket No. 91).*

15.    The GAI executed in favor or Travelers further provides that A.G. Cullen,
Arlene Cullen, and/or Paul Cullen will deposit collateral funds with Travelers upon
Travelers' demand either in an amount of any loss, anticipated loss, or improper
diversion of Trust Funds:

> 5.    <u>Collateral Security</u>:   Indemnitors agree to
> deposit with Company, upon demand, an
> amount as determined by Company sufficient
> to discharge any Loss or anticipated Loss.
> Indemnitors further agree to deposit with
> Company, upon demand, an amount equal to
> the value of any assets or Contract funds
> improperly diverted by any Indemnitor.  Sums
> deposited with Company pursuant to this
> paragraph may be used by Company to pay
> such claim or be held by Company as collateral
> security against any Loss or unpaid premium
> on any Bond.  Company shall have no duty to
> invest, or provide interest on, the deposit.
> Indemnitors agree that Company would suffer
> irreparable damage and would not have an ad
> equate remedy at law if Indemnitors fail to
> comply with the provisions of this paragraph.

*Indemnity Agreement, ¶ 5 (Docket No. 37-4).*

16.    The GAI further provides that any of the following events, *inter alia*, shall
constitute a Default under the Indemnification Agreement:

> (a) a declaration of contract default by any Obligee;
> (b) actual breach or abandonment of any Contract;
> (c) a breach of any provision of this Agreement;
> (d) failure to make payment of a properly due and
> owing bill in connection with any Contract;
> (e) Company's good faith establishment of a reserve;
> (f) Improper diversion of contract funds or any
> Indemnitor's assets to the detriment of Contract

> obligations; … (i) any representation furnished to Company by or on behalf of any Indemnitor proving to have been materially false or misleading when made…

*Indemnity Agreement, ¶ 6 (Docket No. 37-4).*

17.    Paragraph 10 of the GAI provides that indemnitors shall furnish upon demand, and Travelers shall have the right of free access to, at reasonable times, the records of indemnitors including, but not limited to, books, papers, records, documents, contracts, reports, financial information, accounts and electronically stored information, for the purpose of examining and copying them. *Indemnity Agreement, ¶ 10 (Docket No. 37-4).*

18.    Loss is defined under the GAI as loss and expense of any kind or nature, including attorneys' and other professional fees, which Travelers incurs in connection with any Bond or this Agreement, including, but not limited to, all loss and expense incurred by reason of Travelers: (a) making any investigation in connection with any Bond; (b) prosecuting or defending any action in connection with any Bond; (c) obtaining the release of any Bond; (d) recovering or attempting to recover Property in connection with any Bond or this Agreement … . *Indemnity Agreement, ¶ 1 (Docket No. 37-4).*

19.    Arlene Cullen and Paul Cullen are the individual indemnitors under the terms of the bonds and the GAI, and A.G. Cullen Construction, Inc. stands as both Travelers' principal and indemnitor. *Indemnity Agreement, (Docket No. 37-4).*

20.     The County of Butler and A.G. Cullen entered into an agreement effective January 25, 2006, to perform the Butler Project ("Butler Project"). *Defendants' Counterclaim, ¶ 21 (Docket No. 58); Contract 58-4; Plaintiffs' Answer to Counterclaim, ¶ 21, (Docket No. 91);*

21.     A.G. Cullen entered into a contract with East Allegheny School District to perform the Logan Project ("Logan Contract"). *Defendants' Counterclaim, ¶ 22 (Docket No. 58)*; *Plaintiffs' Answer to Counterclaim, ¶ 22, (Docket No. 91).*

22.     The County issued a Notice to Proceed February 2, 2006, with a final completion date of October 13, 2007, a period of 615 days. *February 2, 2006, letter from Patrick Stone, Massaro Corporation, to Paul Cullen (BC-CUL 018137).*

**B.     ISSUES ARISING IN THE FALL OF 2006**

23.     On August 3, 2006, the A.G. Cullen advised the County that they were unable to begin the project on time, due to delays in the shipment of steel, thus delaying the overall completion date. *August 3, 2006, letter from A.G. Cullen to Massaro Corporation (BCT 008367-8368).*

24.     A.G. Cullen requested an extension of time in accordance with the terms of their contract with the County. *August 3, 2006, letter from A.G. Cullen to Massaro (BCT 008367-8368).*

25.     On August 7, 2006, the County advised A.G. Cullen and Travelers that it was "considering declaring a contractor (A.G. Cullen) default and refused

A.G. Cullen's request for an extension because A.G. Cullen's failure to recover lost time constitutes a material breach of the contract." *Deposition Transcript of Julie M. Graham, December 16, 2009, pp. 40-41, 63; August 7, 2006, letter from County to Cullen (BC-CUL 007664).*

26.    Travelers opened a claim file for the Butler County Prison Project upon receipt of correspondence from Butler County demanding a meeting with Travelers in August, 2006. *Deposition Transcript of Shawn Pikas, October 26, 2009, p. 35.*

27.    Paul Cullen told Ms. Pikas that he did not want to pay travel expenses incurred by Travelers in having her attend the meeting in person and requested that she attend the meeting by phone.  *Deposition Transcript of Shawn A. Pikas, October 26, 2009, p. 121.*

28.    An hour later, Roy Cohen, Cullens' attorney, called Ms. Pikas and demanded that she attend the meeting in person and, as a result of the travel, Travelers incurred costs under the GAI.  *Id. at p. 121.*

29.    Massaro Corporation, the Construction Manager for the County, stated that A.G. Cullen had breached the contract in various aspects, including items as critical as "poor workmanship" and "failing to have project management with prison experience." *August 24, 2006, letter from Massaro to A.G. Cullen (BCT 008286).*

30.    The County did not withdraw its Default and Notice of Intent to Terminate letter of August 7, 2006. *Deposition Transcript of Julie M. Graham, December 16,*

*2009, p. 63; June 1, 2007, letter from Julie Graham to Shawn Pikas (DBP 014016-014017).*

31.    On September 7, 2006, counsel for the County's Construction Manager advised Travelers that Butler County questioned A.G. Cullen's ability to continue to work on the Butler Project. *September 7, 2006, letter from Blumling & Gusky, LLP to Travelers (BCT-009043).*

32.    The following day, A.G. Cullen stated that it was "formally invoking its rights ... regarding payment and contract termination," in a letter dated September 8, 2006.   A.G. Cullen provided its seven-day notice to the County to terminate the contract.  *September 8, 2006, letter from Cullen to Butler County (BC-CUL 012469-70).*

33.    On September 26, 2006, A.G. Cullen's counsel informed the County that, "our [the County's] actions had caused great bonding difficulties for Cullen." *September 28, 2007, e-mail from Julie Graham to Butler County Commissioners (MAS-000121-122).*

34.    On October 5, 2006, Arlene Cullen requested Travelers assign Fred Bossard, a Travelers employee, to review minutes of weekly meetings and then visit the Butler County site monthly.  *October 5, 2006, e-mail from Arlene Cullen to Shawn Pikas. (TCSA-00817).*

35.     On December 5, 2006, and December 12, 2006, Ms. Pikas and Attorney Dreifuss, Travelers' counsel, met with the Cullens and Richard Kalson, their attorney. Travelers offered to monitor the Butler Project through an engineering consultant as a means to alleviate Butler's concerns and avert a termination. *Deposition Transcript of David C. Dreifuss, October 9, 2009, pp. 50-52, 54-55.*

36.     On December 12, at a meeting with the County and the Cullens, with Cullen's assent and specific request, Travelers advised the County that Cullens had agreed to have Travelers retain a consultant to assist in monitoring the situation in the field. *Id.*

## C.     ISSUES ARISING FROM JANUARY TO SPRING 2007

37.     On January 9, 2007, the County issued a seven-day Notice of Default/ Termination to the A.G. Cullen. *January 9, 2007, notice from Butler to A.G. Cullen. (RVB-34528).*

38.     On January 18, 2007, during a meeting that was attended by the Cullens and Ms. Pikas, after Buric had been on the site for about four weeks, the County stated that one of the reasons the County was not terminating Cullen was due to Buric's and the surety's on-site presence. *Deposition Transcript of Julie M. Graham, December 16, 2009, pp. 97-101, 105-106.*

39.     In January 2007, A.G. Cullen's Senior Project Manager for the Butler County Prison Project, Jim Henderson, resigned. *Deposition Transcript of James David Henderson, November 18, 2009, pp. 10, 55-56).*

40.     On February 7, 2007, Attorney Kalson advised the County that the A.G. Cullen's reduced bonding capacity directly resulted from the County's unwarranted actions. *February 7, 2007, letter from Attorney Kalson to Graham. (DBP-013370).*

41.     On February 7, 2007, Ms. Pikas requested A.G. Cullen to reimburse Travelers $41,000 in expenses pursuant to the GAI. *February 7, 2007, letter from Pikas to Cullen. (TCSA-00631).*

42.     On April 11, 2007, Attorney Kalson advised Travelers' counsel that A.G. Cullen refused to make the requested payment. *April 11, 2007, letter from Attorney Kalson to Gary Strong, Esquire.*

43.     Previously, however, on February 19, 2007, Paul Cullen informed Shawn Pikas that A.G. Cullen agreed to make installment payments of $10,000 per month against Travelers' loss. *(February 19, 2007, e-mail from Paul Cullen to Shawn Pikas (DBP-013440); February 20, 2007, letter from Pikas to Cullen confirming payment. (BC-CUL 016056).*

44.     On March 8, 2007, Mark McDowell, a certified public accountant employed by Travelers, advised Shawn Pikas that, from his examination of the books and records of A.G. Cullen, $460,000 will be due in the spring of 2007 for the closing of the Cullens' property in St. Maarten. *March 8, 2007, e-mail/report from McDowell to Pikas. (TCSA-10291, 10304).*

45.    Subsequently, Cullens' bank records disclosed that, of the $520,527.80 due at closing on the Cullens' St. Maarten property, $150,000 was paid from the A.G. Cullen business account.

46.    On March 19, 2007, Julie Graham, Solicitor for Butler County, informed Burkley Surety, a bonding company investing Cullens' bondability, that in August, 2006, "Butler put Travelers and A.G. Cullen on notice that we were considering declaring Cullen to be in default of their contract due to several issues."  Graham said that Butler was considering all contractual remedies including assessment of liquidated damages.  *(Bisch to Gigliotti e-mail), Exhibit 369.*

47.    On March 22, 2007, Paul Cullen advised the County that without a retraction by the County of its damaging statements to prospective bonding companies that A.G. Cullen delayed the Butler Project, additional damages are sustained by A.G. Cullen in loss of bonding capacity.  *March 22, 2007, letter from Paul Cullen to Julie Graham. (DBP-013512).*

48.    The following day, March 23, Paul Cullen advised the County that, due to the County's reckless actions, A.G. Cullen has had to lay off employees.  *March 23, 2007, letter from Cullen to Commissioners. (BCT 008967).*

49.    On March 30, 2007, A.G. Cullen's Project Manager on the Logan Project, Doug Aquaviva, gave his two weeks notice.  *March 30, 2007, e-mail from Aquaviva to Paul Cullen (AGC 00113).*

50.    On April 5, 2007, Paul Cullen advised the County that the County's efforts to destroy the A.G. Cullen's business was coming to fruition.  *April 5, 2007, letter from Paul Cullen to County.  (BC-CUL 003211).*

51.    On April 6, 2007, Travelers was informed that Fred Williams, Project superintendent on the Butler Project, and A.G. Cullen's superintendent on the Logan Project had both resigned from their employment with A.G. Cullen.  *April 6, 2007, e-mail from Pikas to Attorney Dreifuss (TCSA-00520).*

52.    On April 13, 2007, A.G. Cullen filed a lawsuit against Butler County in the Court of Common Pleas of Butler County for breach of contract, breach of warranty, and tortious interference with contract. *Exhibit 141.*

53.    In April 2007, Travelers had received two different reports from two different managerial employees of A.G. Cullen that the Cullens were packing up boxes of records to be shipped to St. Maarten.  *Deposition Transcript of Shawn A. Pikas, dated October 27, 2009, p. 367.*

54.    Fred Williams was employed as A.G. Cullen's Project Manager on the Butler County Prison Project in April, 2007.  *Deposition Transcript of Frederick Williams, December 10, 2009, p. 19.*

55.    Fred Williams testified that given the circumstances in April, 2007, he believed it was plausible that the Cullens would flee to St. Maarten and he had heard a rumor that they were going to do so.  He said that there was an impending doom, a

whole aura of doom on the project. He said that the employees didn't know if they were going to have a job tomorrow or not. *Deposition Transcript of Frederick Williams, December 10, 2009, pp. 63; 65-68, 78, 80, 85.*

56. Jeff Roush was employed by R.V. Buric as Travelers' consultant on the Butler Project. Mr. Roush testified that on April 12, 2007, he recorded notes contemporaneous with his telephone discussion with Mr. Williams concerning the Cullens possibly fleeing to St. Maarten, packing up boxes for shipment to St. Maarten and selling off assets. Mr. Roush communicated this information to Ms. Pikas. *Deposition Transcript of Jeffrey Roush, November 30, 2009, pp .187, 189, 191, 194; April 12, 2007, Handwritten Notes of Jeff Roush following conversation with Fred Williams (RVB-27118-27119); Statement of Frederick Williams, September 16, 2009, pp. 7-10.*

57. Ms. Pikas learned about the Cullens packing up documents and shipping the documents to St. Maarten from a telephone conversation she had with Mr. Roush on April 12, 2007. *Deposition Transcript of Shawn A. Pikas, October 26, 2009, p. 171.*

58. Ms. Pikas testified that she had no reason to believe that Mr. Williams and Mr. David Gable had any "ax to grind" or any reason not to be truthful with Mr. Roush in his communications of April 12, 2007 which, in substance, Mr. Roush had discussed with Ms. Pikas the same day. *Deposition Transcript of Shawn A. Pikas, October 26, 2009, p. 191.*

59.     David W. Gable was also a Project Manager for A.G. Cullen on the Butler County Prison Project.  *Deposition Transcript of David W. Gable, January 19, 2010, p. 21.*

60.     Mr. Gable testified that he heard rumors from Renee Hindley and Renee Batronis that the Cullens were packing up boxes of documents and shipping them to St. Maarten.  *(Id. at pp. 25-29.)*

61.     Fred Bossard, Travelers' employee assigned to monitor the Butler Project, testified that Mr. Gable had heard that a Cullen employee had boxed up records and was sending the documents to St. Maarten.  *Deposition Transcript of Frederick S. Bossard, December 7, 2009, pp. 117, 133-134).*

62.     Fred Bossard had no reason to disbelieve Dave Gable's statement concerning St. Maarten.  *Id. at p. 135.*

63.     Renee Batronis was employed by A.G. Cullen as Project Engineer for the Butler County Prison Project.  *Deposition Transcript of Renee L. Batronis, February 15, 2010, p. 23.*

64.     Ms. Batronis testified that she had been told by Renee Hindley that another Cullen employee, Julie was boxing up accounting files which were being shipped to St. Maarten.  *Deposition Transcript of Renee L. Batronis, February 15, 2010, pp. 46, 48.*

65. Ms. Batronis recorded the information in contemporaneous notes. *Deposition Transcript of Renee L. Batronis, February 15, 2010, pp. 13, 23, 116-117, 129; April 27, 2007, Notes of Renee Batronis (BA-00005).*

66. Ms. Batronis asked Renee Hindley whether Hindley believed it was weird that the Cullens were sending accounting files to St. Maarten and Hindley, in response stated, "I don't know.  I do as I am told."  *Deposition Transcript of Renee L. Batronis, February 15, 2010, p. 49.*

67. Ms. Batronis repeated what she had heard from Renee Hindley to Mr. Gable.  *Deposition Transcript of Renee L. Batronis, February 15, 2010, p. 114.*

68. Ms. Batronis believed that the Cullens intended to abscond with project funds based upon a telephone conversation she had with Paul Cullen who was in St. Maarten and told her he was real estate hunting and her discussion with Renee Hindley.  *Deposition Transcript of Renee L. Batronis, February 15, 2010, pp. 60-62, 124, 129.*

69. Ms. Pikas testified that Fred Bossard had told her about his discussion with Mr. Gable relating to St. Maarten.  Mr. Gable's information was similar to the information Mr. Williams had provided Mr. Roush concerning St. Maarten.  *Deposition Transcript of Shawn A. Pikas, October 26, 2009, p. 180.*

70. On April 26, 2007, Paul Cullen wrote the Butler County Commissioners putting them on notice that, "due to your [Butler's] extreme and reckless actions in

August 2006 through the present, A.G. Cullen Construction has subsequently lost all bonding, which is the life blood of our success in this business." *April 26, 2007, correspondence from Paul Cullen to Commissioners (RVB-32649-32653).*

71.     As a result of the Butler County's actions, Paul Cullen identified nineteen (19) jobs dating from February 15, 2007 through April 19, 2007, that A.G. Cullen could not bid due to their lack of bonding. *Id.*

72.     The Project architect, Kimball, in a letter rejecting Cullen's request for reduced retainage, stated "Cullen is not making satisfactory progress, and instead is significantly behind schedule," that Clista Electric, Inc., another prime contractor, submitted a claim of $486,570 to the County and "the Construction Manager has advised the architect that there are instances of defective work not being remedied." *April 27, 2007, correspondence from L. Robert Kimball to County and Cullens.  (BCT 002318-19).*

### D.     ISSUES ARISING IN MAY, 2007

73.     On May 1, 2007, Attorney Kalson, Cullens' counsel, referred to A.G. Cullen's "scarce remaining resources" in a letter to Attorney Dreifuss. *May 1, 2007, letter from Attorney Kalson to Attorney Dreifuss. (RVB-26979).*

74.     On May 3, 2007, Bruno Muscatello, Esquire, counsel for the County, referenced the August 7, 2006, Notice of Intent to Default/Terminate A.G. Cullen and stated that although A.G. Cullen had been permitted to continue to work, but that

Butler did not waive its right to subsequently declare a contractor default. *May 3, 2007, letter from Attorney Muscatello to Attorney Kalson. (LEV-04302-04303).*

75.    On May 4, 2007, Paul Cullen threatened to send another day seven notice of termination to the County. *May 4, 2007, letter from Cullen to County. (BCT 002323-002324).*

76.    On May 9, 2007, Ms. Pikas stated, in her telephone conversation earlier that day with Attorney Kalson and Attorney Dreifuss, that Attorney Kalson reported that Cullen was "hemorrhaging" and that Cullen had "nothing," and when they asked him if A.G. Cullen would complete the Butler and Logan Projects, Attorney Kalson replied that they would have to wait and see.  Attorney Kalson testified he may have used the word "hemorrhaging" to describe A.G. Cullen's financial condition. *May 9, 2007, e-mail from Pikas to Huibregtse and Pieto.  (TCSA-00339); Deposition Transcript of Richard D. Kalson, dated March 3, 2010, p. 238;, June 2, 2007, e-mail from Pikas to Bonacci (TCSA-00099).*

77.    On May 10, 2007, Attorney Kalson informed Attorney Dreifuss that A.G. Cullen "is nothing more than a shell of the company it was at the start of the project." *May 10, 2007, letter from Attorney Kalson to Attorney Dreifuss.  (DBP-013760-013762).*

78.    On May 10, 2007, Massaro confirmed that A.G. Cullen's current Project Manager, Dave Gable, had resigned, that his last day on the Project would be May 11, 2007, and that Massaro was concerned with the experience level, technical

qualifications, and turnover rate of key A.G. Cullen personnel.  *May 10, 2007, letter from Pat Stone to Paul Cullen.  (BCT 009395-009397).*

79.    Gable's resignation marked the third A.G. Cullen Project Manager to resign on the Butler Prison Project during the previous five-month period.  *Id.*

80.    In addition, A.G. Cullen's Director of Operations and Executive Vice President departed A.G. Cullen earlier in the Project.  *Id.*

81.    On May 11, 2007, Attorney Kalson wrote representatives for the County confirming that Mr. Gable was "the latest victim of the hostile project environment created by Butler County and its agents on the new Butler County Prison Project."  *May 11, 2007, letter from Attorney Kalson to Graham et al. (MAS-000473).*

82.    On May 11, 2007, Attorney Kalson represented that "more employees have left A.G. Cullen over the past 8 months than at any other time in its fifteen year history."  *Id.*

83.    On May 14, 2007, Ms. Batronis, A.G. Cullen's Project Engineer for the Butler County Prison Project, resigned from A.G. Cullen effective on May 18, 2007.  *May 14, 2007, letter from Renee Batronis to Paul Cullen.  (AGC 00173).*

84.    On May 21, 2007, Paul Cullen stated that Mr. Gable's resignation was "the latest casualty of Butler County's premature and unnecessary notice of intent to default that was sent in August of 2006."  *May 21, 2007, letter from Paul Cullen to Pat Stone. (MAS -000467-468).*

85.    Mr. Cullen also stated that, "[a]s a result of this notice [intent to default in August 2006] and the subsequent malicious actions of Butler County and its agents, our employees have been fearful of their futures and unfortunately have been seeking employment elsewhere." *Id.*

86.    Massaro, Butler's Construction Manager, on May 24, 2007, stated that Cullen had not undertaken required repair work. *May 24, 2007, e-mail from Massaro to Cullen. (DBP-013877-13878).*

87.    On May 25, 2007, Paul Cullen advised the Construction Manager that "our [A.G. Cullen] employees that have left our employ […] have all left our employ because of your reckless actions and will, if required testify to this. *May 25, 2007, e-mail from Paul Cullen to Pat Stone.  (BCT 009354).*

88.    The following day, May 26, 2007, A.G. Cullen advised Travelers of their intent to issue a seven-day Notice of Intent to Default/Terminate directed to the County. *May 26, 2007, e-mail from Cullen to Travelers. (TCSA-16228).*

89.    On May 27, 2007, A.G. Cullen issued the seven-day Notice of Intent to Default/Terminate.   *May 27, 2007, Notice of Intent to Default/Terminate.  (TCSA-16225-16227).*

90.    On May 30, 2007, Julie Graham, solicitor for the County, requested a meeting with Ms. Pikas to discuss the continuation of the job upon A.G. Cullen's

termination as reflected in A.G. Cullen's May 27 Notice of Intent to Default.  *May 30, 2007, e-mail from Graham to Pikas. (RVB-26982).*

91.    On May 30, 2007, Arlene Cullen, in an e-mail to Ms. Pikas, stated that the retention money which the Cullens claim to be due from the County was "our money."  *Deposition Exhibit 358.*

92.    On May 31, 2007, Mark McDowell, in a telephone conversation with Shawn Pikas, advised her that he did not know what Cullen did with the money that Cullen was paid in March or when Cullen received its checks or whether Cullen's subcontractors were paid.  McDowell further advised that A.G. Cullen was expecting payment of approximately $1.5 million from the Logan Project.  *Deposition Exhibit 253; Deposition Transcript of Shawn A. Pikas, dated October 26, 2009, pp. 262-265.*

93.    As of May 31, 2007, A.G. Cullen's projected completion date of the Butler Project April 16, 2008, was more than six (6) months past the contractual completion date of October 13, 2007.  *(DPB 003906).*

94.    On May 31, 2007, Cost Corporation submitted a claim for an unpaid invoice in the amount of $1,254,000 and requested that the County issue payment to both Cullen and Cost.  *Affidavit of Shawn A. Pikas, Exhibit G, Pawk letter (Docket No. 37-4, p. 37).*

95.     On May 31, 2007, Attorney Dreifuss, in response to an e-mail from Attorney Kalson dated May 30, 2007, stated that Travelers' primary concern was to assure that the funds from the Logan and Butler Projects were utilized for the purpose of completing the projects.  He stated that Travelers was prepared to issue consents of surety on both Logan and Butler Projects with a condition that the funds on the project were deposited in the trust account of Attorney Kalson's law firm, subject to distribution as proposed by the Cullens and approved by Travelers.  Attorney Dreifuss asked Attorney Kalson whether this arrangement was acceptable.  *Deposition Exhibit 124, p. 4.*

96.     Later that day, Attorney Kalson responded that he would discuss with his law firm an arrangement for an escrow account and further stated that the claim from Cost Corporation had no basis.  *Deposition Exhibit 124, p. 3.*

**E.     JUNE 1-6, 2007**

97.     Attorney Dreifuss responded on June 1 that the seven-day notice given A.G. Cullen to the County and the claim from Cost Corporation may adversely impact the relationship between Travelers and A.G. Cullen.  Attorney Dreifuss stated that if he did not hear a response to Travelers' proposal by the following Monday (June 4, 2007), at noon, he would assume the proposal for an escrow account was not acceptable.  Attorney Dreifuss stated, "We are making this proposal in an effort to avoid availing ourselves of actions that are provided for in the Indemnity Agreement and/or at law."  *Deposition Exhibit 124, pp. 2-3.*

98.    Attorney Kalson understood Attorney Dreifuss threatened to sue A.G. Cullen in an action provided for in the Indemnity Agreement and/or at law. *Deposition Transcript of Richard D. Kalson, dated March 4, 2010, p. 320.*

99.    Attorney Kalson responded on June 1, 2007, by rejecting Travelers' proposal to use Attorney Kalson's law firm trust account to process payments. Attorney Kalson stated that A.G. Cullen was amenable to another plan which might include Travelers coming to the Cullen offices when the checks to the suppliers and subs were being prepared and sent. *Deposition Exhibit 124, p. 2.*

100.   Attorney Dreifuss responded by indicating his disappointment with Attorney Kalson's response.  Attorney Dreifuss suggested that the account into which the funds would be deposited from which the checks might be written could be titled "A.G. Cullen Special Account" so that the recipients would not view it as attorney trust checks. *Deposition Exhibit 124, p. 1.*

101.   Attorney Kalson responded that the Cullens were evaluating Travelers' most recent proposal. *Deposition Exhibit 124, p. 1.*

102.   Within a few hours, however, Paul Cullen stated that A.G. Cullen rejected Travelers' proposal to put money into a jointly controlled account and demanded that Travelers maintain the status quo. *Deposition Exhibit 123.*

103.   Attorney Bonacci advised Attorney Kalson that Travelers was in receipt of A.G. Cullen's letter and that it represents A.G. Cullen's final position unless "you tell

us differently, the surety will be left with no alternative but to take whatever actions it deems appropriate and necessary to protect its interest." *June 1, 2007, E-mail correspondence 5:51 p.m., Attorney Bonacci to Attorney Kalson. (TCSA-00103).*

104.   On June 1, 2007, Julie Graham, solicitor for Butler, advised Ms. Pikas the County had received the Cost Construction claim in the amount of $1,254,000. *June 1, 2007, letter from Graham to Pikas. (DBP 014016-014017).*

105.   Attorney Graham also reiterated the County's Notice of Intent to Declare Default dated August 7, 2006. *Id.*

106.   On Saturday, June 2, 2007, Attorney Bonacci e-mailed Attorney Kalson that unless you immediately advise me that the Cullens have changed their position, please consider this a demand pursuant to Section 9 of the GAI ". . . for placement of project funds into a trust account effective upon receipt of this demand . . .." *June 2, 2007, e-mail from Attorney Bonacci to Attorney Kalson, 2:30 P.M., TCSA-00101-00102.*

107.   On June 3, 2007, Paul Cullen issued a seven-day written Notice to Default/Terminate to the County and the architect. *June 3, 2007, letter from Paul Cullen to Butler County. (BCT 001165-001166).*

108.   On Monday, June 4, 2007, at 4:02 P.M., Travelers issued an e-mail to Attorney Kalson requesting the details of where the trust account had been

established and confirmation that Cullen has written to the owners to advise that funds are to be sent to the account.  *Deposition Exhibit 519.*

109.   Travelers did not receive a response from Attorney Kalson to this question and, upon the advice of counsel, authorized the preparation of the pleadings in the underlying action.  *Deposition Transcript of Shawn A. Pikas, dated October 27, 2009, p. 344.*

110.   Attorney Bonacci prepared the Motion for Preliminary Injunction Temporary Restraining Order with the legal assistance of Attorney Dreifuss, Attorney Rogers, and Attorneys Wainwright and Levicoff, counsel for Travelers in Pittsburgh, Pennsylvania.  *Deposition Transcript of JoAnne Bonacci, February 17, 2010, p. 21.*

111.   The Memorandum of Law in Support of the Emergency Motion for Temporary Restraining Order and Preliminary Injunction was prepared by Attorney Bonacci with assistance from Attorney Dreifuss.   Attorney Levicoff and Attorney Wainwright also reviewed it and had their input as well.   *Deposition Transcript of JoAnne Bonacci, February 17, 2010, pp. 24-26.*

112.   On June 5, 2007, Clista Electric, A.G. Cullen's subcontractor on the Butler Project, placed Travelers on notice of a claim against Cullen.  *Exhibit 134 (DBP 007117).*

113.   On June 5, 2007, Attorney Graham advised Attorney Dreifuss that the County will release $713,933.19 to Cullen no later than 4:00 P.M. June 6, 2007. *June 5, 2007, e-mail from Butler County to Attorney Dreifuss. (TCSA-11460).*

114.   On June 5, 2007, Attorney Bonacci forwarded draft pleadings for review and filing to Attorney Wainwright and Attorney Dreifuss.   *June 5, 2007, e-mail from Attorney Bonacci to Attorney Dreifuss and Attorney Wainwright. (LEV-00256-57).*

115.   On June 6, 2007, after reviewing the papers, Attorney Wainwright filed and served the Complaint and Emergency Motion for Temporary Restraining Order and Preliminary Injunction.   *(Docket Nos. 1-6,* <u>*Travelers Cas. & Sur. Co. v.*</u> <u>*A.G. Cullen, et al*</u>*., Civ. A. No. 07-765).*

## F.   DEVELOPMENTS FROM JUNE 7, 2007 – SEPTEMBER 27, 2007

116.   On June 7, 2007, the Court designated the case for placement into the Court's Alternative Dispute Resolution Program.   (Docket No. 7, <u>*Travelers Cas. & Sur.*</u> <u>*Co. v. A.G. Cullen, et al*</u>., Civ. A. No. 07-765).

117.   On June 7, 2007, Attorney Dreifuss and Attorney Kalson agreed that Attorney Kalson will obtain checks from the Logan and Butler Projects and hold the checks pending a settlement via a consent order.   *June 7, 2007, E-mail from Attorney Dreifuss to Attorney Kalson.  (TCSA-07828-7829).*

118.   On the following day, June 8, 2007, Attorney Kalson signed an Acknowledgment of Receipt of $713,933.19 dated May 30, 2007 for the Butler Project. *June 8, 2007, Acknowledgment. (TCSA-11465).*

119.   On June 8, 2007, Travelers filed a Motion to Suspend Case Activity During Settlement Negotiations.   *(Docket No. 11, Travelers Cas. & Sur. Co. v. A.G. Cullen, et al., Civ. A. No. 07-765).*

120.   On June 12, 2007, Arlene Cullen stated to Paul Cullen that, "Butler is run at a loss and funded by Projects such as Logan."   *June 12, 2007, correspondence from Arlene Cullen to Paul Cullen.  (AGC-00237).*

121.   On June 14, 2007, Paul Cullen wrote a letter to the editor of the Pittsburgh Post Gazette in which he states, "A.G. Cullen can only hope that readers of the Pittsburgh Post-Gazette will confront this malicious gossip and rumor-mongering not only as concerns A.G. Cullen but also all other innocent victims of loose talk." *June 14, 2007, Letter from Paul Cullen to the Editor of the Post Gazette (Exhibit 213).*

122.   On June 27, 2007, Travelers filed their Pre-Hearing Conference Memorandum of Law.  Travelers stated that since the parties had amicably resolved the matter in which contract funds received by Cullens were administered and payments to subcontractors and others were coordinated, Travelers narrowed the scope of the hearing to a request for the enforcement of paragraphs 9 (establishment of the trust account) and 10 (access to books and records) of the GAI.  *(Docket No. 21, Travelers Cas. & Sur. Co. v. A.G. Cullen, et al., Civ. A. No. 07-765).*

123.   Counsel for the Cullens stated that "after a very short period" of negotiations which began shortly after the filing of the Emergency Motion, the parties "did in fact reach an interim agreement regarding the distribution of future contract funds paid to A.G. Cullen" as a result of the Butler and Logan Projects.  *A.G. Cullen's Pre-Hearing Memorandum, p. 3, Docket No. 30. Civ. A. No. 07-765.*

124.   On June 28, 2007, the parties reported to the Court that they had arrived at a temporary agreement for handling of payments to subcontractors.   Attorney Levicoff suggested that the parties attempt to narrow the scope of the issues to be decided by the Court that Travelers was seeking emergency relief that "does not more than force the clear terms of the trust provision in the Contract and a related provision that calls for the supply of documentary evidence." *(Docket No. 32 at 5, Travelers Cas. & Sur. Co. v. A.G. Cullen, et al., Civ. A. No. 07-765).*

125.   Attorney Kalson stated that Travelers was calling the Cullens "crooks" and that they were about to "commit a heinous criminal act."  Attorney Kalson stated that the parties did work out a multitude of issues to which the Court responded that many of the pending issues had been resolved.  *Id.  (Docket No. 32, Proceedings at 14, 45.)*

126.   On July 12, 2007, Paul Cullen advised Ms. Pikas that the Cullens "intend to honor your trust account requirements," but then stated "We will have absolutely nothing to do with account."  All deposits and disbursements will be Travelers absolute duty and responsibility.  *Ex. 216, Letter from Paul Cullen to Shawn Pikas.*

127.   On July 16, 2007, at the Hearing on Travelers' Motion, Attorney Dreifuss advised the Court that the issues had been narrowed to the enforcement of paragraphs 9 and 10 of the GAI.  *Docket No. 34, C.A. 07-065, Transcript of Hearing of July 16, 2007, p. 3.*

128.   Attorney Dreifuss also advised the Court of Mr. Cullen's July 12 letter in which Mr. Cullen stated that the Cullens would comply with the Trust account but refused to administer the account in violation of the GAI.  *Id. at 5-6.*

129.   Attorney Kalson stated that he did not believe there were any issues to be decided by the Court, that Travelers had set up an account into which the Cullens had deposited money, and that the Cullens would continue to comply with its obligations to provide whatever financial statements were required by Travelers in compliance with paragraphs 9 and 10 of the GAI.  *Id. at p. 4.*

130.   A.G. Cullen and The Cullens admit that they are bound by Paragraphs 9 and 10 of the GAI.  *(Docket 36 at 2, n.3, C.A. 07-065; Defendants' Opposition to Plaintiff's Supplemental (Post-Hearing) Memorandum in Support of Emergency Motion for Temporary Restraining Order and Preliminary Injunction.)*

131.   Travelers did not offer evidence regarding St. Maarten and the Court was not requested to rule on that St. Maarten evidence at the hearing on July 16, 2007.  *Transcript of Hearing, Docket No. 34, C.A. 07-065.*

132.   On July 27, 2007, Attorney Christopher Furman, counsel for A.G. Cullen wrote Attorney Dreifuss stating that, "A.G. Cullen has expended over $1 Million of its reserves over the first four months of these projects [Butler and/or Logan], and has been operating at a loss up until now." *July 27, 2007, correspondence from Attorney Furman to Attorney Dreifuss.  (LEV-00887-00889).*

133.   On August 1, 2007, the Court denied the Travelers' Motion for Temporary Restraining Order and Motion for Preliminary Injunction without prejudice and ordered the parties to proceed to mediation in order to establish the parameters for the operation and management of the trust fund.  (*Travelers Cas. & Sur. Co. v. A.G. Cullen, et al.*, *Docket No. 40, Civ. A. No. 07-765*).

134.   The Court stated that the parties had negotiated the operation and management of the trust account since the filing of the Motion for Temporary Restraining Order. *Id. at 3, n.1.*

135.   In the Court's Opinion of February 13, 2009, denying Travelers' Motion to Dismiss Amended Complaint in this case, the Court reviewed the August 1 Restraining Order in the underlying case: "Before the Court ruled on said motion, Plaintiffs had begun to make payments to subcontractors on the project, one of the remedies sought by the Motion.   Furthermore, the parties agreed upon the establishment of the trust fund account and agreed to mediate issues pertaining to its operation and management.   In fact, the mediation was fruitful in that the parties settled the issues over the parameters and day-to-day operation of the trust fund account. *(Docket No. 23, pp. 4, 17).*

136.   The Court concluded that the issues surrounding the operation and management of the trust fund account were not terminated in Plaintiffs' favor as defined by the Dragonetti Act. *Memorandum Opinion, February 13, 2009 (Docket No. 23 at 4, 17).*

137.   On September 25, 2007, the parties entered into an agreement, the "Establishment of a New Merrill Lynch Account with Respect to Trust Funds" *(hereinafter "Merrill Lynch Account Agreement") (TCSA 08547-08553).*

138.   Under the terms of the Merrill Lynch Account Agreement, the parties agreed that A.G. Cullen shall provide Travelers with a spreadsheet detailing amounts due to A.G. Cullen's subcontractors on the Butler County Project from A.G. Cullen's pending payment application and/or past payment applications and that within the tenth day of each month A.G. Cullen shall provide Travelers with a spreadsheet detailing amounts due to A.G. Cullen's subcontractors on the Logan Project.   The agreement further provides that A.G. Cullen shall identify any such withholdings or back charges known at the time to be asserted on the spreadsheet and shall provide Travelers with documentation and/or explanation of the basis for such withholding of funds or back charges along with the spreadsheet. *Id. at ¶ 2 (TCSA 08547-48).*

139.   In paragraph 5 of the Merrill Lynch Account agreement, A.G. Cullen agreed to provide copies of all checks written off the Merrill Lynch Account made payable to the subcontractors in the amounts listed in the spreadsheet for the relevant A.G. Cullen payment application to Travelers. *Id. at ¶ 5 (TCSA 08548-49).*

140.   In paragraph 8 of the Merrill Lynch Account agreement, Attorney Kalson, on behalf of A.G. Cullen, agreed to supply Travelers with an affidavit indicating that checks had been mailed to subcontractors and suppliers in accordance with the Pennsylvania Procurement Code at the time such mailing has taken place.  *Id. at ¶ 8. (TCSA 08549).*

141.   In paragraph 21 of the Merrill Lynch Account agreement, A.G. Cullen agreed to provide Travelers with a copy of the Merrill Lynch Account statement each month within five business days after it was received and Travelers shall have read-only on-line access to the Merrill Lynch Account.  *Id. at ¶ 21. (TCSA 08552).*

142.   On September 27, 2007, the minute entry states that the parties agreed that the mediation resolved their dispute as the operation and management of the trust fund; however, the case did not settle and the case was stayed until May 1, 2008.   *(Docket   No. 47)   Travelers   Cas. &   Sur.   Co.   v.   A.G. Cullen,   et al., Civ. A. No. 07-765).*

**G.    CULLENS INITIATE LAWSUITS IN 2008**

143.   On February 4, 2008, the Cullens initiated by Praecipe, a lawsuit in the Court of Common Pleas of Allegheny County of Pennsylvania at G.D. No. 08-002325 naming Renee Batronis, Fred Bossard, Douglas Dougherty, David Gable, R.V. Buric Construction Consultants, Inc. and Jeffrey Roush as Defendants.  *(Praecipe for Writ of Summons, G.D. 08-2325).*

144.   The claims to be asserted are for defamation and will not be pursued if Plaintiff prevails in this case.   *Motion to Stay Rule to File Complaint, ¶ 10, Document 10, filed by Cullens in the Court of Common Pleas of Allegheny County at No. G.D. 08-002325; Letter D. Strassburger to M. Kurzweig, February 2, 2010.*

145.   On August 6, 2008, the Cullens commenced this action in the Court of Common Pleas of Allegheny County and the Defendants removed the case to this Court September 5, 2008*. (Docket No. 1, 1).*   In the Second Amended Complaint, Plaintiffs allege claims under the Dragonetti Act and claims for abuse of process. *(Docket No. 37).*

146.   There is no allegation that Ms. Pikas was acting as counsel for Travelers and there is no allegation that Ms. Pikas acted on behalf of Travelers as legal counsel. *Plaintiffs' Second Amended Complaint, ¶¶ 1-30 (Docket No. 37).*

147.   The Cullens' claims against Travelers are solely based on respondeat superior and/or agency.   *Id.*

148.   The basis of liability against Dreifuss Bonacci & Parker, LLP is respondeat superior and/or agency of Attorney Dreifuss.   *Id.*

149.   The basis of liability against Dreifuss Bonacci & Parker, LLP is respondeat superior and/or agency of Attorney Bonacci.   *Id.*

150.   On June 14, 2007, in a signed letter to the Editor of the Pittsburgh Post-Gazette, Paul Cullen quoted Attorney Kalson's June 1, 2007 e-mail to Attorney

Dreifuss: "the Cullens purchased their residence in St. Maarten with their lifetime savings." *Deposition Exhibit 213.*

151.   Discovery of A.G. Cullen's payment history to Amthor Steel, its steel supplier, shows that A.G. Cullen's payments to Amthor were not current for work performed through February 28, 2007. *AMT 00573-74, DBP 005913, BCT 019226, A.G. Cullen Merrill Account March 1-March 30, 2007.*

152.   A.G. Cullen was paid in full for its Pay Application 12R through February 28, 2007 and Cullen received the funds March 27, 2007, yet Amthor Steel did not receive any payment for the same period until May 21, 2007 at which time Amthor was paid $34,371.58 of its $88,200.00 pay application.  The balance was not paid until after Travelers filed the underlying action. *Id.*

153.   On August 3, 2007, Paul Cullen sent a letter to Shawn Pikas, stating, in part: "Since Travelers first publicly filed its unsubstantiated and false allegations of such horrible criminal wrongdoing, moral turpitude and breaches of business ethics, Arlene and I have devoted a great deal of our time trying to restore even a small portion of our relatively destroyed reputations as honorable citizens and reputable business people."   *August 3, 2007, Letter from Paul Cullen to Shawn Pikas (Exhibit 219).*

154. Paul Cullen testified about the nature of the allegations in Cullens' Second Amended Complaint:

- "It's right there by where it says in the agreement they can sue me in federal court and call me a thief." *Deposition Transcript of Paul L. Cullen, p.167, ll. 21-23;*

- "It's right there by where they say they can sue me in federal court and call me a thief." *Id. at p.168, ll. 5-6.*

- "They sued me in federal court and called me a thief." *Id. at p. 194, ll. 6-7;*

- "I ran out of work, and I laid everybody off because Travelers yanked my bonding and sued me in federal court, saying I was going to run off with project funds to St. Maarten." *Id. at p. 658 l. 25 to p. 659, l. 4.*

155. In his liability analysis on behalf of the Cullens, Harry Woodruff Turner, testified that he held Ms. Pikas to the same standards as Attorney Dreifuss and Attorney Bonacci as "Attorney Defendants" and that, in his analysis, it did not matter whether she was functioning "somewhat as a client." *Deposition Transcript of Harry Woodruff Turner, dated July 13, 2010, pp. 61, 63, 68-69, 71, 73, 76, 194.*

156. Mr. Turner testified that he did not consider the advice of counsel defense available to Ms. Pikas and/or Travelers and Mr. Turner did not offer an opinion regarding "improper purpose" or whether the filing was not intended merely to harass or maliciously injure the opposing party under the Dragonetti Act. *Deposition of Harry Woodruff Turner, dated July 13, 2010, pp. 68-69, 71, 74-76, 100-101.*

157. Michael P. Rollage, Plaintiffs' damages expert, testified that "The lawsuit on June 6[th] accused the company of dishonesty, in essence. The fear of any bonding company is going to be that the principals will flee with bonded proceeds and leave

the bonding company holding the bag.  To learn that the principals of this company were going to leave the country or accused of leaving the country, I don't know a bonding company in the country or the world that would touch them with a ten-foot pole." *Deposition Transcript of Michael P. Rollage, dated July 1, 2010, p. 124.*

158.   Mr. Turner testified that Travelers' liability is limited to its vicarious responsibility for the conduct of Shawn A. Pikas.   *Deposition Transcript of Harry Woodruff Turner, Esquire, dated July 13, 2010, p. 62.*

159.   Mr. Turner did not consider the level of cooperation of the Cullens as a factor in his analysis of probable cause. *Id*. *at p. 95.*

160.   Mr. Turner stated that Travelers was motivated, in filing suit, to avoid any payment on the bond.  *Id*. *at pp. 106-07.*

161.   A pay-if-paid clause is not an ironclad defense to a subcontractor's claim for payment.  *Deposition Transcript of Michael Rollage, dated July 1, 2010, p. 108.*

162.   Attorney Kalson did not deny the rumors.  *Expert Report of Stanley M. Stein, Esquire, pp. 28-29, 56 (Docket No. 163); June 1, 2007 e-mail correspondence from Dreifuss to Kalson (Docket No. 14 Exhibit A); Deposition Transcript of Shawn A. Pikas, dated October 26, 2009, p. 175, ll. 11-16, 20-23.*

163.   Arlene Cullen testified that Travelers filed suit because:

(1) Retaliation for making Shawn Pikas look "stupid." *Deposition Transcript of Arlene Cullen, dated October 20, 2009, pp. 304-305, ll. 23-6;*

(2) Travelers wanted to help Cost Company because it was a targeted account of Travelers. *Id. at pp. 394-395, ll. 25-1;*

(3) Travelers wanted A.G. Cullen to spend money on attorneys' fees so that it would not have the resources to pursue its bad faith claims against Travelers. *Id. at p. 293, ll. 1-11*; and

(4) Defendants sought to embarrass and humiliate A.G. Cullen *Second Amended Complaint, ¶¶ 51, 61 (Docket No. 37).*

164. Attorney Kalson testified that Shawn Pikas filed suit to:

(1) Travelers wanted to "cripple" and destroy A.G. Cullen. *Deposition Transcript of Richard D. Kalson, dated March 4, 2010, p. 418 16-18*; and

(2) Attorney Dreifuss wanted to charge attorneys' fees to Travelers. *Id. at pp. 419-420.*

165. Paul Cullen testified about the events leading up to June 6, 2007, that, "I don't believe that this is something that – well, maybe they did wake up one morning and just decide to screw us royally, but I don't see Travelers just waking up every morning and going, who are we going to sue today […]." *Deposition Transcript of Paul Cullen, dated October 14, 2009, pp. 609-610.*

166. Stanley M. Stein, Esquire, Defendants' liability expert, testified the complete circumstances surrounding the filing of the Emergency Motions. He stated that the filing of the Motions for Injunctive Relief resulted from the troubled history between the County and Cullen and Cullen and Travelers, a history which threatened to result in termination of the Butler contract, Cullen's financial collapse, and the need

for Travelers to complete the Butler contract, which, in turn, would have resulted in a significant financial loss to Travelers. *Expert Report of Stanley M. Stein, Esquire, p. 32 (Docket No. 163).*

167. Gary P. Hunt, Defendants' liability expert, in reviewing the chronology of events, concluded that the Butler Project was thoroughly dysfunctional and that the Injunction Motion was fully justified and, if Defendants had failed to move for emergency relief when they did, they might have been criticized for not acting sooner. *Expert Report of Gary P. Hunt, pp. 16-17 (Docket No. 162).*

168. Richard A. Kowalczyk, Defendants' surety expert, stated that the filing of the Emergency Motion for Temporary Restraining Order was well within the norms, customs and standards of the surety industry based on the twenty-one (21) factors outlined in his report. *Expert Report Richard A. Kowalczyk, pp. 14-16 (Docket No. 164).*

169. Mr. Turner concludes in his report: "The conduct of Travelers and its counsel in filing the Motion was grossly negligent and, considering the nature of the allegations, constituted outrageous conduct." *Expert Report of Harry Woodruff Turner, p. 9 (Docket No. 152).*

Respectfully submitted,

DICKIE, McCAMEY & CHILCOTE, P.C.

By/s/ *W. Alan Torrance, Jr.*_____
   W. Alan Torrance, Jr., Esquire
   PA I.D. # 49592

   Stephen M. Houghton, Esquire
   PA I.D. # 31622

Two PPG Place, Suite 400
Pittsburgh, PA  15222-5402
Tel:  (412) 281-7272
Fax:  (412) 392-5367
e-mail:  atorrance@dmclaw.com
       shoughton@dmclaw.com

Attorneys for Defendants,
Travelers Casualty and Surety Company of
America, Shawn A. Pikas, Esquire, David C.
Dreifuss, Esquire, JoAnne Bonacci, Esquire,
and Dreifuss Bonacci and Parker

## **CERTIFICATE OF SERVICE**

I certify that a true copy of the above document was filed through the ECF system and will be electronically served on all counsel of record who is registered participants.

Respectfully submitted,

DICKIE, McCAMEY & CHILCOTE, P.C.

Dated:  September 1, 2010

By/s/ *W. Alan Torrance, Jr.*
        W. Alan Torrance, Jr., Esquire
        PA I.D. # 49592

        Stephen M. Houghton, Esquire
        PA I.D. # 31622

Two PPG Place, Suite 400
Pittsburgh, PA  15222-5402
Tel:  (412) 281-7272
Fax:  (412) 392-5367
e-mail:  atorrance@dmclaw.com
          shoughton@dmclaw.com

Attorneys for Defendants,
Travelers Casualty and Surety Company of America, Shawn A. Pikas, Esquire, David C. Dreifuss, Esquire, JoAnne Bonacci, Esquire, and Dreifuss Bonacci and Parker

.